Mann Wyatt Tanksley
201 E 1st Ave.
Hutchinson, KS 67501
(620) 662-2400
(620) 662-2443 (Fax)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Q.R. a minor, by and through his natural mother and next friend JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>ICF TECHNOLOGY INC.; ACCRETIVE TECHNOLOGY GROUP, INC.; 4355768 CANADA INC. D/B/A CRAKMEDIA NETWORK; and JOHN DOE, D/B/A JERKMATE.COM,<br><br>Defendants. | )<br>)<br>)<br>) Case No. 25 CV _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

For his cause of action against Defendants ICF Technology Inc., Accretive Technology Group, Inc., 4355768 Canada Inc. d/b/a CrakMedia Network, and John Doe d/b/a jerkmate.com, Plaintiff Q.R., a minor, by and through his natural mother and next friend Jane Doe alleges and states:

## Parties

1. Plaintiff Q.R. ("Plaintiff") is a minor child who is domiciled in Olathe, Johnson County, Kansas. Plaintiff's claims in this matter are brought by and through his natural mother and next friend, Jane Doe, with whom he resides. At all times relevant to this Complaint, Plaintiff was physically present in the state of Kansas.

2.   Defendant ICF Technology, Inc. ("ICF") is a commercial entity whose principal office is located at 800 Stewart St. Seattle, Washington, 98101, United States. ICF is incorporated in the state of Washington. Upon information and belief, its directors are Shawn Boday and Ross Perkins. At all times relevant to this Complaint, ICF owns and/or knowingly hosts jerkmate.com and/or jerkmatelive.com. Upon information and belief, ICF may be served with process through its registered agent, Registered Agents Inc., at 100 N. Howard St. Ste. R, Spokane, Washington, 99201, United States.

3.   Defendant Accretive Technology Group, Inc. ("Accretive") is a commercial entity which shares its principal office with ICF at 800 Stewart St. Seattle, Washington, 98101, United States. Accretive owns more than 10% of ICF's stock. Accretive is incorporated in the state of Washington. Upon information and belief, its directors are Shawn Boday and Ross Perkins. At all times relevant to this Complaint, Accretive owns and/or knowingly hosts jerkmate.com and/or jerkmatelive.com. Upon information and belief, Accretive may be served with process through its registered agent, Shawn Boday, at 800 Stewart St. Seattle, Washington, 98101, United States.

4.   Defendant 4355768 CANADA Inc. d/b/a CrakMedia Network[1] ("CrakMedia") is a foreign commercial entity incorporated in Canada. Their principal office is located at 410 Charest Blvd. Est, Suite 500, Quebec, QC G1K 8G3, Canada. At all times relevant to this Complaint, CrakMedia owns and/or knowingly hosts jerkmate.com and/or jerkmatelive.com. Upon information and belief, CrakMedia may be served with process at the above listed address.

5.   Defendant John Doe d/b/a jerkmate.com ("John Doe"), is a commercial entity whose true identity is currently unknown. At all times relevant to this Complaint, John Doe owns and/or knowingly hosts jerkmate.com and/or jerkmatelive.com. Upon information and belief, John Doe

---

[1] Privacy Policy, *Crakmedia*, https://crakmedia.com/en/privacy-policy/ (last visited Jan. 28, 2025).

may be served with process at any address identified during the course of discovery where they may be found to be conducting business.

## Jurisdiction and Venue

6. This Court may properly exercise personal jurisdiction over all parties. This Court has subject matter jurisdiction over this case. Venue is proper in this forum.

### *Personal Jurisdiction*

7. This Court has personal jurisdiction over Plaintiff as he is domiciled in Kansas.

8. This Court may properly exercise personal jurisdiction over Defendants ICF, Accretive, CrakMedia, and John Doe (collectively "Defendants") under K.S.A. § 60-308(b)(1)(A) as Defendants, at all times relevant to this Complaint, have engaged in business in the state of Kansas via consumer transactions. Defendants are further subject to this Court's jurisdiction pursuant to the Kansas Consumer Protection Act, specifically K.S.A. § 50-638(a).

9. This Court may properly exercise personal jurisdiction over Defendants under K.S.A. § 60-308(b)(1)(B) as they have committed a tortious act within the State of Kansas by allowing Plaintiff, who is a minor, to access content that is harmful to minors without employing reasonable age verification as required by K.S.A. § 50-6,146.

10. In the alternative of, or in addition to the above paragraph, this Court may properly exercise personal jurisdiction over Defendants under K.S.A. § 60-308(b)(1)(G)(i)-(ii) as Defendants caused an injury to Plaintiff, who is a minor, through an act or omission which took place outside of the state of Kansas while: (i) they were engaged in solicitation or service activities in the state of Kansas; and/or (ii) products, materials or things processed, serviced or manufactured by the defendant anywhere were used or consumed in the state of Kansas in the ordinary course of trade or use.

11. This Court may properly exercise personal jurisdiction over Defendants under K.S.A. § 60-308(b)(1)(L) as Defendants maintain minimum contacts with Kansas such that maintaining this lawsuit does not offend traditional notions of fair play and substantial justice.

### *Subject Matter Jurisdiction*

12. This Court has subject matter jurisdiction over the cause of action under 28 U.S.C. § 1332(a) given the parties diversity of citizenship and the fact that the amount in controversy exceeds $75,000.00.

13. This Court has subject matter jurisdiction over this case pursuant to the Kansas Consumer Protection Act, K.S.A. § 50-623 *et seq.* because Defendants have engaged in consumer transactions in the State of Kansas.

### *Venue*

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 2255(c) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

### **Background Facts**

15. In 2024, Kansas Legislature passed Ch. 28, §1 (S.B. 394), (now K.S.A. 50-6,146), requiring the use of age verification technology to prevent access to internet websites containing content that is harmful to minors.

16. This law became effective on July 1, 2024, and is known as the Internet Content Harmful to Minors legislation.

17. This law was passed in bipartisan fashion in response to a prior resolution adopted by the Kansas Senate "recognizing that pornography is a public health hazard that leads to a broad spectrum of individual and public health impacts and societal harms." That resolution recognized

"the need for additional educational, prevention, research, and policy change at the community and societal level, and [] urg[ed] this chamber and other governing bodies, to take appropriate steps to ensure progress was made" on fighting the very real impacts that pornography has. 2017 Bill Text KS S.R.1723.

### Defendants' Relationship to jerkmate.com and jerkmatelive.com

18. Defendants are part of a broader network of commercial entities which own and/or knowingly host websites that are replete with nudity and a variety of sexual content. Kansas law requires commercially reasonable age verification methods on websites containing such material that is harmful to minors. At all times relevant to this Complaint, Defendants did not employ any manner of age-gating technology on their websites, resulting in those websites remaining freely open and accessible to anyone.

19. Regarding this broader network, ICF and Accretive are just two among many pornographic commercial entities operated by Shawn Boday and Ross Perkins, all of which are headquartered or hosted at 800 Stewart St., Seattle, Washington, 98101. These entities include, but are not limited to:

    a.  Streamate.com, which is owned and operated by ICF.[2] [3] [4]

    b.  Eplay.com, which is owned and operated by DLX Media.[5]

---

[2] Trademark Status Document Retrieval for Application No. 77848743, *U.S. Patent and Trademark Office*, https://tsdr.uspto.gov/#caseNumber=77848743&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch (last visited Jan. 28, 2025).

[3] Privacy Policy, *Streamate*, https://streamate.com/docs/privacy-policy (last visited Jan. 28, 2025).

[4] Streamates Limited, LLC listed Shawn Boday as its registered agent, but was dissolved in 2015. Streamate's April 2020 performer agreement refers to ICF Technology, Inc. as Streamate. *See* Streamate, Performer Agreement, https://streamatehelp.com/wp-content/uploads/2020/05/performer-agreement-2020-05.pdf (last visited Mar. 20, 2025).

[5] U.S. Patent & Trademark Office, *TSDR Case No. 87911758*, https://tsdr.uspto.gov/#caseNumber=87911758&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch (last visited Jan. 14, 2025).

   c.   Metart.com, which is owned and operated by SARJ, LLC, who is currently being

        sued by the Kansas Attorney General's office for failing to employ reasonable age

        verification on metart.com.[6]

   d.   Camwild.com, which is owned and operated by Accretive.[7]

   e.   CamTV, SexTracker, and Streamfans, whose trademarks are owned by ICF.

20.    Of all these websites, the most relevant to this Complaint is Streamate.com. Upon

information and belief, Defendants use Streamate to recruit, manage, and supply models for their

broader network of webcam based pornography websites (the "Streamate Network"), which

includes jerkmate.com and jerkmatelive.com.

21.    Defendants claim that if a prospective cam model creates an account with

Streamate, their profile will appear on the entire Streamate Network of over 4,000 popular live

adult chat sites."[8] Among these chat sites are jerkmate.com and jerkmatelive.com, which is a white

label website of streamate.com.

22. In a nutshell, a white label website is a website that is created by one company and then

rebranded by another, making it appear as though the latter developed it.[9] While the rebranding

company gives the website its own identity, the original infrastructure remains intact and under

the control of the creating company. This process is known as "white label integration."

---

[6] Isaac Deer, *Kris Kobach Files Lawsuit Against Adult Website Operator*, WIBW (Jan. 14, 2025),
https://www.wibw.com/2025/01/14/kris-kobach-files-lawsuit-against-adult-website-operator/.
[7] U.S. Patent & Trademark Office, *TSDR Case No. 97193069*,
https://tsdr.uspto.gov/#caseNumber=97193069&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch (last visited Mar. 20, 2025).
[8] Streamate Models, https://www.streamatemodels.com/#learn-more (last visited Mar. 20, 2025).
[9] Drew Gainor, *Why a White Label Solution Is Easier Than Building Your Own*, Forbes (June 3, 2014),
https://www.forbes.com/sites/theyec/2014/06/03/why-a-white-label-solution-is-easier-than-building-your-own/ (last visited Jan. 14, 2025).

23. In the context of webcam-based pornography websites, white label integration results in nearly identical content across multiple websites, with the only distinction being branding elements. In other words, while the same videos and models appear on both platforms, the duplicate website modifies its visual presentation, such as logos, color schemes, and other design features, to create a distinct identity.

24. Through this process, ICF and Accretive allow other entities to promote duplicate websites of streamate.com, in exchange for a share of the duplicate websites' revenue.

25. Jerkmatelive.com is one such duplicate of Streamate. While its infrastructure is hosted, owned, and operated by ICF and Accretive,[10] and some or all of its models are being managed[11] by ICF and Accretive, the website's trademarks are owned by CrakMedia,[12] who is responsible for the website's branding and marketing.

26. Similarly, jerkmate.com, whose trademarks are also owned by Crakmedia, serves as the promotional website to jerkmatelive.com, but still relies on ICF and Accretive's infrastructure, support and management.

27. Defendants describe the relationship between the three websites as follows: "Jerkmatelive.com is simply the Member Zone of Jerkmate, a white label of Streamate. Now, are you wondering what is a white label? Don't rush to your preferred search engine. We'll tell you what it means. You'll notice that you can find the same models and content on other cam sites. This ensures greater distribution and, therefore, better visibility for all rooms while respecting the

---

[10] Jerkmatelive.com's privacy policy describes itself as an ICF Technologies website. *See* Privacy Policy, *Jerkmate Live*, https://jerkmatelive.com/docs/privacy-policy (last visited Jan. 28, 2025)

[11] Before a model can be featured on the "Streamate Network," they must agree to ICF and Accretive's terms and conditions which regulates how the models are to conduct themselves. *See* Streamate Models, Code of Conduct, https://www.streamatemodels.com/docs/code-of-conduct?from=SM (last visited Mar. 20, 2025).

[12] Trademark Status Document Retrieval for Application No. 90369950, *U.S. Patent and Trademark Office*, https://tsdr.uspto.gov/#caseNumber=90369950&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch (last visited Jan. 28, 2025)

geotargeting and other limitations initially imposed by the model. The White Label principle allows to 'brand' the container, such as Jerkmate Live, but not the content, such as categories and all cam rooms provided by Streamate. Thanks to a solid partnership built up over the last few years, Jerkmate can now promote Streamate's models and content through jerkmate.com, the promotional site of Jerkmate Live, where all the fun happens!"[13]

28. In sum, CrakMedia, ICF, and Accretive all work together to own, manage, and knowingly host jerkmate.com and jerkmatelive.com.

### Defendants' role as content providers and developers

*Defendants develop and own third-party content*

29.     Defendants develop content provided by third parties, specifically, user data provided by its users who are consuming webcam and other pornography, and other content provided by persons engaging in webcam and other pornography.

30.     Defendants do this in part by creating tags and categories for the pornographic content on Jerkmate.com and jerkmatelive.com, and by suggesting searches and categories.

31.     For instance, Jerkmate.com auto-shows trending searches, trending webcam performers, and trending videos, which include titles and partial descriptions. Furthermore, Jerkmate.com's categories and tags include the following:

      a.   "Hot Cam Girls," "English Speaking Models," "New Models," Low-Priced Cams," and "Upcoming Gold Show";

      b.   Sex cam tags, which include:  "Teen(18+)," "Milf," "Squirt," "Ebony," "BBW," "Asian," "Big Tits," "Latina," "Feet," "Dirty," "Deepthroat," and "Sex Toy"; and

---

[13] What is Jerkmate Live?, *Jerkmate FAQs*, https://jerkmate.com/faq/what-is-jerkmate-live (last visited Jan. 28, 2025).

    c.  "Live Nude Cams," "Cam Girls," "Ebony Cams," "Milf cams," "Sex Videos,"

"Porn games," "Jerkmate TV," and "Camsfinder."

32.    Defendants also develop content on their sites by offering both general advice and its own customized assistance to webcam pornography performers, presumably to maximize their profits.

33.    As Streamate's recruiting website states:

NO EXPERIENCE is necessary! Though previous experience always helps, if you're confident, have a great personality, and money-motivated, then becoming a webcam model is for you. If you need advice on how to maximize your earning potential, your Streamate representative will be available to assist you.[14]

34.    Indeed, Defendant have sent Streamate representatives to various pornography-related conferences, such as XBiz, to recruit more webcam performers for their websites.[15]

35.    Defendants exercise control over the content on its websites, preventing anyone who is not a "verified Content Provider[]" from uploading "any image, video, sound, text, email, or any other type of file or media which is publicly viewable on our website."[16]

36.    Defendants assert that they own all display names.

37.    Defendants also record and store all content posted on their sites, including live webcam sessions: "In providing real-time or live video streaming services, we operate on a platform that we are able to fully control and that allows for real-time monitoring and the removal of the Content being streamed."[17]

---

[14] Streamate Recruiting, *FAQ*, https://streamaterecruiting.com/faq/#toggle-id-3 (last visited Mar. 20, 2025).

[15] Streamate Recruiting, *January 2020 Events*, https://streamaterecruiting.com/events_jan2020/ (last visited Mar. 20, 2025).

[16] Jerkmate, *Terms of Service*, https://jerkmate.com/terms (last visited Mar. 20, 2025).

[17] *Id.*

38.     Streamate's May 2022 code of conduct included a non-compete rule:  "Streamate agrees that Performer will be allowed to own and operate a personal website. Provided, that Performer agrees not to solicit customers and/or other Performers through his/her personal website that is or may be in direct or indirect competition with Streamate."

39.     More to the point, Defendants own the content on their sites and reserve the right to repackage and re-use it.

40.     Streamate's May 2020 Performer agreement provides that Defendants own all content that a webcam performer puts on the site:

> Performer/Studio will upload and transmit content in the form of images, video, sounds, and/or text (referred to herein as "content") to and through Streamate's systems for re-broadcast. All content uploaded to the systems by Performer/Studio shall be works made for hire under the United States Copyright Act, as amended, to the extent eligible; otherwise, Performer/Studio hereby assigns all rights, title and interests in such content to Streamate. Streamate shall then own all such content, and Streamate will have the sole discretion to use any such content in any way it so chooses, including but not limited to in any medium and in any promotion, distribution, advertising, sales and marketing efforts, both during and after the term of this Agreement.[18]

41.     The content apparently owned by Defendants is considerable:  their network of websites boasts 200 million daily visitors to its "web properties," more than $2 billion ad impressions daily, and 5 terabytes of content uploaded daily.[19]

*ICF also provides its own content*

42.     Defendants' websites jerkmate.com and jerkmatelive.com include content and features that are their own, and not provided by outside parties.

---

[18] Streamate, *Performer Agreement* (May 2020), https://streamatehelp.com/wp-content/uploads/2020/05/performer-agreement-2020-05.pdf (last visited Mar. 20, 2025).

[19] ICF Technology, https://icftechnology.com/ (last visited Mar. 20, 2025).

43.    For example, Defendants use a custom AI tool, described thus:

We know from experience how difficult it can be to find the right model.  That's why we've made it extremely easy to find your ideal cam partner (AKA masturbation companion) with direct assistance from our AI robot, Jerky!  Take full advantage of our machine learning system and use it to meet, chat, and flirt with beautiful live cam girls, guys, trans and couples from all walks of life.  Simply put, no other adult cam comes close.

44.    The JerkyAI feature includes a banner that reads "I am mostly attracted by" to allow users to select women's ethnicities – the listed options are "Caucasian," "Ebony," "Latina," and "Asian."

45.    Defendant's tout their uniqueness, claiming that due to the "launch of Jerkmate.com, the world of live sex cams changed forever. Welcome to the most interactive, entertaining, addictive, and technically advanced adult chat on the web!"

46.    Finally, Defendant's have created their own "interactive sex game," stating that users can control the webcam performers through it:

Perhaps you've played interactive sex games before.  But we promise you've never tried like **Command and Obey**.  Jerkmate is proud to present a free porn game that takes interactivity to a mind-blowing new level.  Fun, addictive, diverse and original, nude games such as this have never been seen on the web.  Though others will imitate it, there's only one sex game where you take full control of the hottest top pornstars.  Select your favorite actions from a menu of naughty possibilities.

***Defendants' Knowingly Share or Distribute Content That is Harmful to Minors***

47. Jerkmate.com is a pornography website that knowingly shares or distributes material containing nudity, sexual conduct, sexual excitement and/or sadomasochistic abuse.[20] Such material appears on 25% or more of jerkmate.com's web pages when viewed on said website

---

[20] True and correct screen captures of Defendants' website http://www.jerkmate.com taken on Feb. 05, 2025, attached as Exhibit A and incorporated by reference herein, are subject to a pending Motion to Seal.

during any calendar month. This material is considered "harmful to minors" as, when taken as a whole, an average adult person and/or a reasonable person would find such material: (1) has a predominant tendency to appeal to a prurient interest in sex to minors; (2) is patently offensive to prevailing standards in the adult community with respect to what is suitable for minors; and (3) lacks serious literary, scientific, educational, artistic or political value for minors.

48. To illustrate this fact, jerkmate.com's meta description reads: "[w]atch sexy cam models. Start a chat or private cam to cam session. Jerk off to live sex cams. Join Jerkmate for free!" See the true and accurate screen capture taken January 24, 2025, below:



49. Jerkmatelive.com is a pornography website that knowingly shares or distributes material containing nudity, sexual conduct, sexual excitement and/or sadomasochistic abuse.[21] Such material appears on 25% or more of jerkmatelive.com's web pages when viewed on said website during any calendar month. This material is considered "harmful to minors" as, when taken as a

---

[21] True and correct screen captures of Defendants' website http://www.jerkmatelive.com taken on Mar. 26, 2025, attached as Exhibit B and incorporated by reference herein, are subject to a pending Motion to Seal.

whole, an average adult person and/or a reasonable person would find such material: (1) has a predominant tendency to appeal to a prurient interest in sex to minors; (2) is patently offensive to prevailing standards in the adult community with respect to what is suitable for minors; and (3) lacks serious literary, scientific, educational, artistic or political value for minors.

50. At all times relevant, Defendants provided the technology and resources necessary to store and maintain the electronic files and applications associated with jerkmate.com and/or jerkmatelive.com on a computer server in order for such websites to be accessible via the internet.

### *Defendants Target Kansas Citizens*

51. Defendants do a substantial amount of business in Kansas through jerkmate.com and/or jerkmatelive.com as they engage in selling subscriptions to Kansas Citizens and direct advertisements to Kansas Citizens.

52. Furthermore, Defendants have expressly aimed jerkmate.com at Kansas Citizens, including Plaintiff.

53.    Defendants have contracted with Amazon CloudFront, a content delivery network ("CDN"), to enhance the speed and performance of jerkmate.com for users in and around Olathe, Kansas.

54.    A CDN is a network of servers that cache content closer to a website's users, enabling faster and more reliable communication between a website and its end users despite the parties' geographic distance.[22] This network is organized into strategically placed points of presence ("PoPs") in high traffic internet areas worldwide. These PoPs house edge servers which deliver cached content to nearby users.[23]

---

[22] Cloudflare, *What Is a CDN?*, https://www.cloudflare.com/learning/cdn/what-is-a-cdn/ (last visited Dec. 18, 2024).
[23] CacheFly, *Why Points of Presence (PoPs) Are Pivotal for Optimal CDN Performance*, https://www.cachefly.com/news/why-points-of-presence-pops-are-pivotal-for-optimal-cdn-

55.     In simpler terms, a CDN replicates a website's original content and distributes these copies across its global network of PoPs. By placing these copies in edge servers geographically closer to users, a CDN significantly enhances speed, reliability, and the overall user experience for a website.

56.     For websites hosting high-definition videos or streaming content, a CDN ensures efficient and uninterrupted playback for users near these edge servers. This service is critical for any website as users tend to drop off quickly when a website slows down.[24]

57.     In the present case, Defendants have contracted with Amazon CloudFront to cache and serve the content they host through edge servers located in Kansas City, Missouri, less than 25 miles from Plaintiff's domicile.

58.     Despite expressly aiming their websites at Kansas citizens, Defendants have failed to ensure that jerkmate.com and/or jerkmatelive.com comply with Kansas law which requires pornographic websites to employ age verification measures, either through a "commercially available database" that can verify age and identity, or "any other commercially reasonable method of age and identity verification." K.S.A. § 50-6,146(a)(1)-(2).

59.     Defendants have not implemented reasonable age verification methods as mandated by K.S.A. § 50-6,146(a)(1)-(2) to verify the age of its users on jerkmate.com. Instead, minors who visit the website are either immediately presented with sexual material harmful to minors with no form of verification needed, or they are simply asked to complete the trivial step of clicking an "I AGREE" button, which ostensibly verifies the user is over the age of 18. The age

---

performance/#:~:text=Each%20PoP%20contains%20a%20group,deliver%20what%20you%20need%20quickly (last visited Dec. 18, 2024).

[24] Cloudflare, *What Is a CDN?*, https://www.cloudflare.com/learning/cdn/what-is-a-cdn/ (last visited Dec. 18, 2024).

verification methods used by jerkmate.com cannot be said to verify anything at all, and wholly fail to comply with the requirements of Kansas law. See below for an image of jerkmate.com's inadequate age verification method as of November 12, 2024.



60.     Defendants have not implemented reasonable age verification methods as described in K.S.A. § 50-6,146(a)(1)-(2) to verify the age of its users on jerkmatelive.com. Instead, minors who visit the website are immediately presented with sexual material harmful to minors with no form of verification needed, wholly failing to comply with the requirements of Kansas law.

*Q.R.'s Access to jerkmate.com and/or jerkmatelive.com*

61.    Q.R. is a 14-year-old minor child who lives in Olathe, Kansas with his mother and next friend Jane Doe. Jane Doe has taken steps to monitor her son's devices for pornography, as she recognizes the danger that such material poses to boys like Q.R. during this developmental stage of his life.

62.    However, on August 12, 2024, Q.R. found Jane Doe's old laptop in her closet. She had stored the device there a couple of years ago after purchasing a new laptop and had since forgotten about it. Unfortunately for Q.R., it was still in working condition.

63.    Q.R., using his mother's old laptop, had unfettered access to the internet and began searching for pornography.

64.    Through this process, Q.R. was able to access jerkmate.com on three different instances:

      a.    Two instances on September 17, 2024, and

      b.    One instance on September 30, 2024.

65.    Through this process. Q.R. was able to access jerkmatelive.com on four different instances:

      a.    Three instances on September 17, 2024, and

      b.    One instance on September 19, 2024.

66.    Q.R. has been harmed by Defendants' own acts and/or omissions as they failed to employ age verification as mandated by Kansas Law on jerkmate.com and/or jerkmatelive.com.

67.    In the alternative of, or in addition to the above paragraph Plaintiff was harmed as he was able to view content harmful to minors that was hosted on Defendants' websites. Had

Defendants employed reasonable age verification techniques, as required by Kansas law, Q.R. would not have been able to view such material.

### **Count 1**

### *Plaintiff Q.R.'s Claim Against Defendants for Their Violations of K.S.A. § 50-6,146*

68.    Plaintiff incorporates all the preceding paragraphs here by reference.

69.    Defendants are commercial entities that knowingly share or distribute materials that are harmful to minors on jerkmate.com and jerkmatelive.com. In conjunction with this claim, or in the alternative, Defendants knowingly host jerkmate.com and jerkmatelive.com.

70.    As such, under Kansas law, Defendants have a duty to verify that any person attempting to access jerkmate.com and jerkmatelive.com, who is a resident of the State of Kansas or located in the State of Kansas at the time of such attempted access, is 18 years of age or older.

71.    Defendants failed to implement reasonable age verification methods regarding access to jerkmate.com and jerkmatelive.com as required by K.S.A. § 50-6,146(a)(1)-(2).

72.    As Plaintiff, who is a resident of Kansas, and was located in Kansas at all times relevant to this Complaint, was able to access jerkmate.com and jerkmatelive.com on seven separate instances between the two websites, Defendants are each liable for seven separate violations of K.S.A. § 50-6,146.

73.    Consequently, pursuant to K.S.A. § 50-6,146 Plaintiff prays for judgment against Defendants in an amount in excess of $75,000.00 for:

      a.    actual damages resulting from Q.R.'s access to material that is harmful to minors, including but not limited to past medical expenses, future medical expenses, past and future lost services and disability, past and future pain, suffering, and disability;

b.  statutory damages in an amount not less than $50,000 per violation regardless of whether any third-party content hosted by Defendants harmed Plaintiff;

c.  reasonable attorney fees and costs of this action; and

d.  for such other and further relief as this Court deems just and equitable.

## Count 2

*Plaintiff Q.R.'s Claim Against Defendants for Unconscionable Acts or Practices.*

74.    Plaintiff incorporates all the preceding paragraphs here by reference.

75.    For purposes of the remedies and penalties provided by the Kansas Consumer Protection Act, K.S.A. § 50-623 *et seq.*, pursuant to K.S.A. § 50-6,146(d)(1), Defendants are deemed a supplier and Plaintiff is deemed a consumer.

76.    Defendants knowingly took advantage of Plaintiff's inability to reasonably protect his interests due to his age, limited knowledge of the internet, ignorance of available protections for minors, and inability to understand the terms and conditions of use. Defendants were aware that minors like Plaintiff may not understand the terms and conditions of their sites, the legal protections that should have been available to them, and/or the harm associated with viewing content that is harmful to minors.

77.    Despite this, Defendants shared, distributed, and/or knowingly hosted sexually explicit material on jerkmate.com and jerkmatelive.com, without implementing reasonable age verification methods restricting access to jerkmate.com and jerkmatelive.com as required by K.S.A. § 50-6,146(a)(1)-(2).

78.    Furthermore, as Plaintiff, who is a citizen of Kansas, and was located in Kansas at all times relevant to this complaint, was able to access jerkmate.com and jerkmatelive.com on seven separate instances between the two websites, Defendants have each committed seven

separate violations of K.S.A. § 50-6,146, which holds that each such violation is an unconscionable act or practice under the Kansas Consumer Protection Act, K.S.A. § 50-623 *et seq.*

79.    As such, Defendants have each committed seven separate violations of the Kansas Consumer Protection Act, K.S.A. § 50-623 *et seq.*, including, but not limited to, violations of K.S.A. § 50-627.

80.    Consequently, Plaintiff prays for a judgment against Defendants in an amount in excess of $75,000.00, for:

a.    Damages, or civil penalties pursuant to K.S.A. § 50-636(a) of not more than $10,000 per violation of the Kansas Consumer Protection Act, K.S.A. § 50-623 *et seq.*, whichever is greater, regardless of whether any third-party content hosted by Defendants harmed Plaintiff;

b.    reasonable attorney fees and costs of this action pursuant to K.S.A. § 50-634(e); and

c.    for such other and further relief as this Court deems just and proper.

## Count 3

### *Plaintiff Q.R.'s Claim of Negligence Against Defendants*

81.    Plaintiff incorporates all the preceding paragraphs here by reference.

82.    At all times relevant to this complaint, Defendants owed a duty to Plaintiff to use that degree of care exercised by a reasonably careful designer, manufacturer, seller, distributor, and/or installer in the same business as Defendants.

83.    Defendants are negligent and 100% at fault for Plaintiff's damages by failing to implement reasonable age verification methods on their websites jerkmate.com and

jerkmatelive.com so as to protect minors, such as Plaintiff, from its content which is considered to be harmful to minors.

84.     As a direct and proximate result of Defendants' negligence, Plaintiff has suffered and will continue in the future to suffer the following damages:

    a.   Pain, suffering, disability, disfigurement, and mental anguish;

    b.   Psychological injury;

    c.   Past and future loss of enjoyment and pleasure of living; and

    d.   Past and future expenses of necessary medical care and treatment.

85.     All of Plaintiff's injuries, disabilities, infirmities, and damages are permanent, painful, and progressive in nature and extent.

86.     Consequently, Plaintiff prays for a judgment against Defendants in an amount in excess of $75,000.00, Plaintiff's costs incurred herein, and for such other and further relief as this Court deems just and proper.

## **Count 4**

### ***Plaintiff Q.R.'s Claim of Negligence Per Se Against Defendants***

87.     Plaintiff incorporates all the preceding paragraphs here by reference.

88.     Defendants have a duty to comply with Kansas Law.

89.     Defendants breached that duty by failing to implement reasonable age verification methods as required by K.S.A. § 50-6,146(a)(1)-(2).

90.     K.S.A. § 50-6,146 was enacted with the goal of protecting minors in Kansas from being harmed by content that is harmful to minors, such as pornography.

91.     Plaintiff, who is a minor, is therefore in the class of persons K.S.A. § 50-6,146 was intended to protect. Furthermore, Plaintiff's damages incurred due to Defendants' lack of age verification are the type of harm K.S.A. § 50-6,146 was enacted to prevent.

92.     Accordingly, Defendants are negligent per se.

93.     As a direct and proximate result of Defendants' acts and omissions in this regard, Plaintiff has suffered and will continue in the future to suffer the following damages:

     a.   Pain, suffering, disability, disfigurement, and mental anguish;

     b.   Psychological injury;

     c.   Past and future loss of enjoyment and pleasure of living; and

     d.   Past and future expenses of necessary medical care and treatment.

94.     All of Plaintiff's injuries, disabilities, infirmities, and damages are permanent, painful, and progressive in nature and extent.

95.     Consequently, Plaintiff prays for a judgment against Defendant in an amount in excess of $75,000.00, Plaintiff's costs incurred herein, and for such other and further relief as this Court deems just and proper.

## Count 5

### *Plaintiff Q.R.'s Products Liability Claim Against Defendants*

96.     Plaintiff incorporates all the preceding paragraphs here by reference.

97.     Defendants are the manufacturer and/or seller of jerkmate.com and jerkmatelive.com, which are products under Kansas Product Liability Act, and at all times relevant to this complaint were under Defendant's control.

98.     Plaintiff contends that these websites are products based on the following:

a. Defendants describe their websites as products. For example, ICF's tagline is, "Building great products through superior engineering."[25] And on ICF's career page it boasts to prospective employees, "Right now is the perfect time to join ICF because your potential to influence virtually every corner of our product is almost limitless."[26]

b. Defendants employ Product Managers whose job description is described as "product lead of a domain."[27] A domain refers to a website.[28] ICF describes itself as "the world leader in live streaming technology - powering some of the biggest websites."[29]

c. Defendants treat their websites as products in marketing and promotional efforts. ICF Technology describes its marketing strategy saying, "[w]e present our final products to the world through reliable marketing connections that we have had for years, and by making use of our extensive partner network."[30]

99. Defendants' products are a danger and/or hazard to Minors. The research is overwhelming that exposure to content like that on Defendants' website is harmful to children in the following ways:

---

[25] ICF Technology, https://icftechnology.com/ (last visited Jan. 30, 2025).

[26] ICF Technology, *Careers*, https://icftechnology.com/career (last visited Jan. 30, 2025).

[27] ICF Technology, *Career Opportunities*, https://icftechnology.com/career (last visited Jan. 30, 2025); *see also I*CF Technology, *Group Product Manager/Product Owner,* https://careers.icftech.hu/o/group-product-managerproduct-owner-2 (last visited Jan. 30, 2025).

[28] "A domain name is a unique name that identifies an Internet resource such as a website." Columbia Univ., *Internet Domain Name Policy*, https://universitypolicies.columbia.edu/content/internet-domain-name-policy (last visited Jan. 30, 2025).

[29] ICF Technology, *About Us*, https://icftechnology.com/about-us (last visited Jan. 30, 2025).

[30] ICF Technology, *Operations*, https://icftechnology.com/ (last visited Jan. 30, 2025).

a. Exposure to pornography disrupts the natural formation of children's sexual-arousal templates. In other words, it significantly impacts "the total constellation of thoughts, images, behaviors, sounds, smells, sights, fantasies, and objects that arouse [people] sexually."[31] The overwhelming majority of data supports the idea that a minor's sexual development can be significantly impacted by the minor's pornography viewing experiences."[32] Further, as scholars of behavioral neurobiology have noted, "It is becoming increasingly clear that there is a critical period of sexual behavior development that forms around an individual's first experiences with sexual arousal and desire, masturbation, orgasm, and sexual intercourse itself."[33] Thus, pornography exposure, particularly at a young age, is of great concern because of its ability to influence and shift the natural development of the sexual-arousal templates of minors.

b. Pornography exposure is associated with wide ranging attitudinal harms for children such as permissive sexual attitudes.[34]

c. Pornography exposure is associated with wide ranging behavioral harms for children such as: (1) early sexual debut,[35] which is associated with an increased risk

---

[31] Patrick Carnes, David L. Delmonico, and Elizabeth Griffin, IN THE SHADOWS OF THE NET: BREAKING FREE OF COMPULSIVE ONLINE SEXUAL BEHAVIOR 58 (2nd ed. 2009).

[32] Emily F. Rothman, pornography AND PUBLIC HEALTH 139 (2021).

[33] James G. Pfaus, Tod E. Kippin, Genaro A. Coria-Avila, et al., *Who, What, Where, When (and Maybe Even Why)? How the Experience of Sexual Reward Connects Sexual Desire, Preference, and Performance*, 41 ARCHIVES OF SEXUAL BEHAVIOR 31-62 (2012), https://doi.org/10.1007/s10508-012-9935-5.

[34] The phrase "permissive sexual attitudes" is used widely within research literature on pornography to describe a range of receptive views toward casual, uncommitted sexual relations devoid of romantic attachments. *See* Jochen Peter and Patti M. Valkenburg, *Adolescents and pornography: A Review of 20 Years of Research*, 53 THE J. OF SEX RESEARCH, no.4-5, 2016, at 1–23, https://doi.org/10.1080/00224499.2016.1143441.

[35] Victor Strasburger, *Media Matter: But 'Old' Media May Matter More than 'New' Media*, 25 AM:STARS ADOLESCENT MEDICINE: STATE OF THE ART REVIEWS: SOCIAL NETWORKING & NEW TECHNOLOGIES, no. 3, 2014, at 643–669, https://doi.org/10.1542/9781581108927-media_matter.

of acquiring STIs[36] and unintended pregnancies which often results in adverse consequences for both mother and child;[37] (2) "casual" or "impersonal sex;[38] (3) condomless sex;[39] (4) a much greater number of lifetime sex partners;[40] (5) group sex;[41] (6) increased vulnerability to sexual assault;[42] (7) sex under the influence of substances;[43] (8) child on child harmful sexual behaviors;[44] and (9) prostitution and sex trafficking.[45]

---

[36] Theo G.M. Sandfort, Mark Orr, Jennifer Hirsch, et al., *LongTerm Health Correlates of Timing of Sexual Debut: Results from a National US Study*, 98 AM. J. OF PUB. HEALTH, no. 1, 2008, 155–161, https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2006.0 97444.

[37] Cheryl B. Aspy, Sara K. Vesely, Eleni L. Tolma, et al., *Youth Assets and Delayed Coitarche across Developmental Age Groups*, 30 THE J. OF EARLY ADOLESCENCE, no. 2, 2010, at 728, https://www.researchgate.net/publication/234074313_Youth_Assets_and_Delayed_Coitarche_Across_Developmental_Age_Groups.

[38] Dolf Zillman and Jennings Bryant, *Effects of Prolonged Consumption of pornography on Family Values*, 9 J. OF FAMILY ISSUES 9, no. 4, 1988, at 521, https://doi.org/10.1177/019251388009004006.; Tokunaga, Wright, and Roskos, supra note 33.

[39] Robert S. Tokunaga, Paul J. Wright, and Laurens Vangeel, *Is pornography Consumption a Risk Factor for Condomless Sex?*, 46 HUM. COMM. RSCH. 278 (2020), https://doi.org/10.1093/hcr/hqaa005.

[40] A study found that young adults who had not viewed pornography were expected having 3.5 sexual partners in the next five years, while those who viewed pornography multiple times per day were expected to have 17 partners in the next five years. *See* Scott Braithwaite and Frank Fincham, *The Influence of pornography on Sexual Scripts and Hooking Up among Emerging Adults in College*, 44 ARCHIVES OF SEXUAL BEHAV., 111-23 (2015): https://doi.org/10.1007/s10508-014-0351-x.

[41] Emily F. Rothman, Michele R. Decker, Elizabeth Miller, et al., *Multi-person Sex among a Sample of Adolescent Female Urban Health Clinic Patients*, 89 J. OF URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED., no. 1, 2011, at 129–137, https://doi.org/10.1007/s11524-011-9630-1.

[42] Maria Testa and Jennifer A. Livington, *Alcohol Consumption and Women's Vulnerability to Sexual Victimization: Can Reducing Women's Drinking Prevent Rape?*, 44 SUBSTANCE USE & MISUSE, 1349–1376 (2009):, https://www.tandfonline.com/doi/full/10.1080/10826080902961468; Lorraine Burke, Kate Dawson, William F. Flack, et al., *Alcohol, Drug Use, and Experiences of Sexual Violence Victimisation among First-year College Students in Ireland*, J. OF SEXUAL AGGRESSION (2023), https://doi:10.1080/13552600.2023.2216221.

[43] Debra K. Braun-Courville and Mary Rojas, *Exposure to Sexually Explicit Web Sites and Adolescent Sexual Attitudes and Behaviors*, 45 J. OF ADOLESCENT HEALTH, no. 2, 2009 at 156-162, https://doi.org/10.1016/j.jadohealth.2008.12.004.

[44] Rebecca Dillard, Kathryn Maguire-Jack, Kathryn Showalter, et al., *Abuse Disclosures of Youth with Problem Sexualized Behaviors and Trauma Symptomology*, 88 CHILD ABUSE AND NEGLECT, 201-11 (2019), https://doi.org/10.1016/j.chiabu.2018.11.019.

[45] Gert Martin Hald, Lisette Kuyper, Philippe, C.G. Adam, et al, *Does Viewing Explain Doing? Assessing the Association between Sexually Explicit Materials Use and Sexual Behaviors in a Large Sample of Dutch Adolescents and Young Adults*, 10 THE J. OF SEXUAL MEDICINE, no. 12, 2013, 2986-95, https://doi.org/10.1111/jsm.12157.

*Q.R. v. ICF Technology, Inc. et al.*
Complaint
Page 24 of 27

d.  Pornography addiction adversely impacts academic achievement.[46]

100.    Defendants know, or by the exercise of reasonable care, should know that their product is harmful to children. This is evidenced by the "no minors-zero tolerance," provision in its terms of service.[47] Jerkmate.com's terms of service has an entire subsection dedicated to forbidding minors to use its website, even addressing potential minor users directly saying, "IF YOU ARE UNDER 18 YEARS OF AGE . . . YOU MUST IMMEDIATELY LEAVE OUR WEBSITE NOW."

101.    Additionally, K.S.A. § 50-6,146's passage and enactment puts Defendants on constructive and/or actual notice that their website is harmful to children, like Plaintiff.

102.    Defendants know, or by the exercise of reasonable care, should know that children access their websites. Unfortunately, it is widely known that children are regular users of pornography websites with approximately 73% of children having *admitted* to viewing pornography as of 2022.[48]

103.    It is unreasonably dangerous for Defendants to provide these products which they know is harmful to children, that children are drawn to access, and do access, without employing age verification to prevent children, like Plaintiff, from accessing theses websites.

104.    Accordingly, Defendants have a duty under K.S.A. § 60-3305 to protect against a danger or hazard which could or did arise in the use or misuse of jerkmate.com and jerkmatelive.com.

---

[46] Ine Beyens, Laura Vandenbosch, and Steven Eggermont, *Early Adolescent Boys' Exposure to Internet pornography: Relationships to Pubertal Timing, Sensation Seeking, and Academic Performance*, 35 THE J. OF EARLY ADOLESCENCE, no. 8, 2015, at 1045-1068, https://doi.org/10.1177/0272431614548069.
[47]

[48] Michael B. Robb and Supreet Mann, *Teens & pornography*, COMMON SENSE MEDIA (Jan 10, 2023), https://www.commonsensemedia.org/research/teens-andpornography.

105.    Defendants have breached this duty by failing to implement reasonable age verification methods on jerkmate.com and jerkmatelive.com as described in, and required by K.S.A. § 50-6,146(a)(1)-(2).

106.    Additionally, Defendants have a duty to warn against a danger or hazard which could or did arise in the use or misuse of jerkmate.com and jerkmatelive.com under K.S.A. § 60-3305.

107.    Defendants have breached this duty by failing to warn Plaintiff of the foreseeable harms that would occur if Plaintiff accessed Defendants' websites.

108.    As a direct and proximate result of Defendants' failure to warn and/or protect against a danger or hazard which could or did arise in the use or misuse of jerkmate.com and jerkmatelive.com. Plaintiff has suffered and will continue in the future to suffer the following damages:

    a.  Pain, suffering, disability, disfigurement, and mental anguish;

    b.  Psychological injury;

    c.  Past and future loss of enjoyment and pleasure of living; and

    d.  Past and future expenses of necessary medical care and treatment.

109.    All of Plaintiff's injuries, disabilities, infirmities, and damages are permanent, painful, and progressive in nature and extent.

110.    Consequently, Plaintiff prays for a judgment against Defendants in an amount in excess of $75,000.00, Plaintiff's costs incurred herein, and for such other and further relief as this Court deems just and proper.

**Demand for a Jury Trial**

111.    In accordance with applicable Kansas law, Plaintiff Q.R., by and through his natural mother and next friend, Jane Doe respectfully demands a trial by a jury of twelve persons of all issues raised in his Complaint.

Dated: January 28, 2025

Respectfully submitted,

*/s/Joshua W. Ruhlmann*
Michael J. Wyatt          (#23260)
Joshua W. Ruhlmann       (#29778)
MANN WYATT TANKSLEY
201 E. 1st Ave.
Hutchinson, KS  67504-1202
(620) 662-2400
(620) 662-2443 (Fax)
mike@mannwyatt.com
josh@mannwyatt.com

and

Danielle Pinter*
Benjamin W. Bull*
Christen M. Price*
Victoria Hirsch*
Khari James*
NATIONAL CENTER ON
SEXUAL EXPLOITATION
1201 F St., NW, Suite 200
Washington, DC 20004
P: 202-393-7245
E: dpinter@ncoselaw.org
bbull@ncose.com
cprice@ncoselaw.org
vhirsch@ncoselaw.org
kjames@ncoselaw.org

*Pro hac vice motions forthcoming

*Attorneys for Plaintiff*